IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ANN MARIE REYHER, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 16-1757 |
| | : | |
| GRANT THORNTON, LLP, | : | |
| Defendant. | : | |

**July 6, 2017**                                                                                           **Anita B. Brody, J.**

## MEMORANDUM

Defendant Grant Thornton, LLP ("Grant Thornton") moves to dismiss Plaintiff Ann Marie Reyher's Second Amended Complaint. Although the Parties raise myriad arguments, resolution of the motion to dismiss ultimately depends upon the answer to a single question: Does Reyher qualify as a whistleblower under the Dodd-Frank Wall Street Reform and Consumer Protection Act? The answer to this question is no, and I will therefore dismiss Reyher's Dodd-Frank whistleblower claim with prejudice. Because the Dodd-Frank claim provides the sole basis for original federal jurisdiction, the prevailing law strongly suggests that I must, unfortunately, decline to continue exercising supplemental jurisdiction over Reyher's Pennsylvania state law claims. I will therefore dismiss Reyher's remaining claims, without prejudice to Reyher to refile in a court of competent jurisdiction.

### I. FACTUAL BACKGROUND[1]

#### A. Reyher Joins Grant Thornton

Reyher is a Certified Public Accountant with over twenty years of experience. Prior to January 25, 2016, Reyher was employed as a Senior Manager by the professional services firm

---

[1] All facts are taken from Reyher's Second Amended Complaint, ECF No. 96. This Opinion includes only the facts that are relevant to the resolution of Reyher's Dodd-Frank whistleblower claim (Count VIII).

1

Ernst & Young, where she led a group responsible for individual and trust tax services. In her position at Ernst & Young, Reyher retained a number of sought-after clients. Reyher was first contacted about the possibility of joining Grant Thornton in November 2015. A recruiting process ensued, that led to Reyher joining Grant Thornton on January 25, 2016, as a Managing Director in the Philadelphia office. Throughout the recruiting process, Reyher requested and received numerous assurances that her responsibilities at Grant Thornton would be limited to her area of expertise, "handling individual and fiduciary tax returns for the Private Wealth Services Team." Sec. Am. Compl. 5, ECF No. 96. Reyher was further assured that she would be assigned to a particular group that "exclusively handled individuals and trusts." *Id*.

Upon beginning work at Grant Thornton, Reyher quickly discovered that all was not as had been represented. On her second day of work, Reyher received a list of assigned clients that included only corporate clients, rather than individuals and trusts. Reyher repeatedly expressed her distress about this to managers at Grant Thornton, including Partner 1 and Partner 2,[2] but to no avail.

### B. Reyher Discovers Accounting Irregularities

Despite Grant Thornton's misrepresentations, Reyher nevertheless began performing work for her assigned corporate clients. She began to discover accounting irregularities within the statements and filings of her new clients. Reyher alleges that Grant Thornton employees, including Partner 1, knowingly included inaccurate information in client tax documents. She further alleges that she complained to administrators at Grant Thornton about these irregularities and inaccuracies, stating that she believed they "amounted to bank fraud, mail fraud, wire fraud, and/or fraud against shareholders." *Id*. at 12. Reyher repeatedly conveyed to Grant Thornton

---

[2] Because Plaintiff's Second Amended Complaint was filed under seal, I use pseudonyms when discussing specific Grant Thornton employees and clients.

2

partners that she refused to engage in any illegal activity. Reyher's Second Amended Complaint alleges irregularities or improprieties related to four specific clients.

      i. <u>Client A</u>

Reyher identifies Client A as consisting of "approximately thirty (30) partnerships and three (3) S Corporations," with "approximately $700 million in revenue." Sec. Am. Compl. 9, ECF No. 96. Reyher alleges that she noticed "questionable practices" relating to Client A, "including problematic deductions and inaccurately recorded intercompany transactions." *Id*. Specifically, she alleges that, during a meeting in February 2016, employees of Client A's family office indicated that the leader of Client A frequently drove expensive automobiles for personal use, while classifying the costs of these automobiles as being related to a foundation. The employees also discussed other intercompany transactions that raised Reyher's suspicions. When Reyher expressed her concerns to partner Partner 1, she was rebuffed. Reyher later became aware of "additional errors and inaccuracies relating to Client A's intercompany transactions, including transactions in excess of $1 million which were not properly reported or not reported at all." *Id*. at 10. When she raised these concerns with Partner 1, she was again rebuffed and told to "stop asking questions." *Id*.

      ii. <u>Client B</u>

Reyher identifies Client B as a "large corporation" with a family office. *Id*. Reyher alleges that, during a meeting with a family office employee of Client B, the employee revealed to Reyher that Client B performed extensive work in Philadelphia but did not file Philadelphia tax returns. Reyher presented this issue to Partner 1 and was told that she should not address the issue with the client.

      iii. <u>Client C</u>

Reyher alleges that Client C "intended to claim only $83,000 worth of alimony payments despite records showing that he paid approximately $500,000 in alimony." *Id*. at 11. Reyher also alleges that her review of Client C's documents revealed that "despite projected income of $8,000,000, income was being calculated at just $2,000,000 for extension purposes." *Id*. Reyher alleges that when she raised these issues with Partner 1, Partner 1 again told her to stop asking questions.

    iv. <u>Client D</u>

Reyher learned that Client D had gifted a large house to an employee. When Reyher approached Partner 1 to discuss whether the employee had incorrectly failed to pay a gift tax, Partner 1 responded "that is none of your business." *Id*. After subsequently questioning the employee, Reyher was told by Partner 1 that she was no longer permitted to work with Client D. Reyher also alleges that the files and work papers of Client D were stored on a hard drive referred to by Grant Thornton employees as the "Super Secret Drive." Only a handful of Grant Thornton employees were aware of or had access to this secret drive.

    v. <u>Corporate Status of Clients A, B, C, and D</u>

Reyher's Second Amended Complaint does not include any allegations that Clients A, B, C, or D are publicly traded companies, nor does it include any information that would identify them as such. As noted above, Client A is identified as consisting of "approximately thirty (30) partnerships and three (3) S Corporations," and Client B is identified as a "large corporation" with a family office. *Id*. at 9-10. The Second Amended Complaint does not explicitly identify Client C, but the Complaint includes information—such as statements about Client C making alimony payments—that implies that Client C is an individual. The Second Amended Complaint does not identify the status of Client D.

### C. Grant Thornton Fires Reyher

On March 18, 2016, only seven weeks after commencing employment with Grant Thornton, Reyher met with a senior managing partner of the Philadelphia office (Partner 3) and a staff member from the human resources department. Reyher's employment was terminated at this meeting. In response to her questions, Partner 3 told Reyher that she was being terminated because she "had been 'disruptive,' did not want to be at Grant Thornton, and 'was not a good fit for our culture.'" *Id*. at 15. Reyher alleges that she was terminated in retaliation for her complaints about accounting irregularities and her refusal to engage in illegal activity. In Count VIII of her Second Amended Complaint, Reyher asserts that her termination was in violation of the whistleblower protection provision found in section 922 of the Dodd-Frank Act. Reyher also alleges that, following her termination, Grant Thornton took actions to harm her reputation and preclude her from accepting new employment. These allegations form the basis of a number of Reyher's state law claims.

Because Count VIII of Reyher's Second Amended Complaint asserts a claim arising under the laws of the United States, I exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, I currently exercise supplemental jurisdiction over Reyher's additional claims brought under Pennsylvania state law.[3] I exercise personal jurisdiction because this lawsuit arises out of Reyher and Grant Thornton's purposeful contacts with Pennsylvania,

---

[3] The current operative Complaint asserts only federal question jurisdiction (Count VIII) and supplemental jurisdiction (all other counts). *See* Sec. Am. Compl. 2, ECF No. 96. The Second Amended Complaint does not assert diversity jurisdiction. Reyher's Original Complaint, however, included only Pennsylvania state law claims. *See* Compl. 18-28, ECF No. 1. The Original Complaint incorrectly alleged that Grant Thornton is "an Illinois corporation with its corporate headquarters and principal place of business in Illinois," and asserted federal subject matter jurisdiction solely on the basis of diversity of citizenship. *Id*. at 2. Grant Thornton, LLP is, in fact, not a corporation, but rather a limited liability partnership. "[T]he citizenship of partnerships and other unincorporated associations is determined by the citizenship of its partners or members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). In declining to assert diversity jurisdiction in her Second Amended Complaint, Reyher may have reasonably concluded that at least one member of Grant Thornton is a citizen of New Jersey— Reyher's own state of residence—thus defeating diversity.

namely Grant Thornton's Philadelphia office. Venue is proper because a substantial portion of the events giving rise to this action occurred in the Eastern District of Pennsylvania.

## II. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to determine the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must engage in the following analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013), *as amended* (May 10, 2013) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted).

6

Thus, a court may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

III. **DISCUSSION**

Reyher argues that her termination from Grant Thornton violated section 922 of the Dodd-Frank Act. Section 922 prohibits an employer from discharging an employee in retaliation for that employee having engaged in certain types of protected whistleblowing activity. 15 U.S.C. § 78u-6(h)(1)(A). The statute lists the different types of whistleblowing disclosures that are protected, many of which are, in turn, defined in other parts of the federal securities laws. One type of disclosure listed in section 922 of the Dodd-Frank Act is a "disclosure[] that [is] required or protected under the Sarbanes-Oxley Act of 2002." 15 U.S.C. § 78u-6(h)(1)(A)(iii). Thus, if an employee makes a disclosure that is required or protected under the Sarbanes-Oxley Act ("SOX") and that employee is fired as a result of making the SOX-protected disclosure, that employee's termination would violate section 922 of the Dodd-Frank Act.

In this case, Reyher asserts that her internal complaints regarding Clients A, B, C, and D qualify as disclosures that are protected under SOX, specifically 18 U.S.C. § 1514A. She further claims that she was terminated by Grant Thornton in retaliation for making these disclosures, and that her termination therefore violated section 922 of Dodd-Frank. In response, Grant Thornton argues that Reyher's internal complaints regarding Clients A, B, C, and D do not qualify as disclosures protected under § 1514A, and, as a result, she has failed to state a claim for retaliatory termination in violation of section 922 of Dodd-Frank.[4]

**A. History & Overview of the Sarbanes-Oxley & Dodd-Frank Whistleblower**

---

[4] As further explained in subsection III.A, there are other types of disclosures that are covered by section 922 of the Dodd-Frank Act. Reyher, however, has only argued that she made disclosures that are required or protected under section 1514A. *See* Pl.'s Resp. to Def.'s Mot. to Dismiss 28-32, ECF No. 103-2.

7

**Provisions**

In 2002, Congress passed the Sarbanes-Oxley Act in order to "safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014). As the Supreme Court has observed, Congress was particularly concerned by the fact that contractors and subcontractors to Enron—most notably the accounting firm Arthur Andersen—participated and were complicit in Enron's immense scheme of shareholder fraud. *Id*. at 1162-63. As a result, SOX "contains numerous provisions aimed at controlling the conduct of accountants, auditors, and lawyers who work with public companies." *Id*. at 1162.

Section 806 of SOX, which is codified as 18 U.S.C. § 1514A, is titled Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud.[5] As relevant here, subsection 1514A(a), titled Whistleblower Protection for Employees of Publicly Traded Companies, states:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)) . . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge . . . an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
>> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—
>> . . .
>>> (C) a person with supervisory authority over the employee (or such other

---

[5] The provision in question is properly referred to as section 806 of SOX. *See* Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 806, 116 Stat. 802. Section 806, however, simply inserts a new § 1514A into title 18 of the United States Code. I will therefore follow the convention of the Supreme Court in *Lawson* and refer to the provision as section 1514A or, when necessary for purposes of clarification, section 1514A of SOX. *See* 134 S. Ct. 1158, 1163 (2014).

8

person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A(a)

Eight years after SOX, following the global financial crisis of 2008, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Section 922 of the Dodd-Frank Act adds incentives and bolsters existing protections for whistleblowers. 15 U.S.C. § 78u-6. The statute defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the securities laws to the [Securities Exchange] Commission, in a manner established, by rule or regulation, by the Commission."[6] § 78u-6(a)(6). Subsection 922(h)(1)(A) contains the anti-retaliation provision that Reyher invokes. In relevant part, the statute reads:

> No employer may discharge . . . or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—
> …
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A)

Thus, the Dodd-Frank anti-retaliation provision incorporates other sections of the federal securities laws, including SOX. If an individual makes a disclosure that is protected by SOX and is terminated from his or her employment as a result of that disclosure, the individual can bring

---

[6] Although the statute speaks of reporting violations "to the Commission," there is currently a circuit split as to whether an employee who reports violations only internally may nevertheless qualify as a whistleblower under Dodd-Frank. The Fifth Circuit has taken the position that an employee must report violations directly to the SEC to receive whistleblower protection. *See Asadi v. G.E. Energy (USA), LLC*, 720 F.3d 620 (5th Cir. 2013). The Second Circuit, in contrast, has concluded that internal reporting may be sufficient. *See Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 153-54 (2d Cir. 2015). The Third Circuit has not yet addressed this question.

In this case, all parties agree that Reyher only engaged in what could arguably be considered internal reporting. There is no contention that she ever provided information directly to the SEC or any other federal agency. I make no ruling as to whether internal reporting is sufficient to establish a Dodd-Frank anti-retaliation claim, because, in this case, I find that the motion to dismiss should be granted even if reporting internally qualified Reyher as a whistleblower.

9

an action for retaliatory termination under section 922 of the Dodd-Frank Act.[7]

Reyher argues that she qualifies as a whistleblower under SOX, and specifically under § 1514A, because: (1) Grant Thornton is a contractor to publicly traded companies; (2) Reyher made internal complaints to her supervisors at Grant Thornton regarding practices of Clients A, B, C, and D which she reasonably believed constituted mail fraud, bank fraud, wire fraud, or fraud against shareholders; and (3) Reyher was terminated by Grant Thornton because of these complaints. Notably, Reyher does not allege that there was any connection between Grant Thornton's work for publicly traded companies and Reyher's internal complaints regarding Clients A, B, C, and D. Reyher's Second Amended Complaint includes no allegations that she performed any work on behalf of publicly traded companies or that any of the practices she complained of implicated publicly traded companies. Reyher does not allege in any of her pleadings that Clients A, B, C, and D are themselves public companies or consist of public companies. Indeed, based on the facts alleged in Reyher's Second Amended Complaint, it appears almost certain that they are not.

Reyher argues instead that Grant Thornton's unrelated work for publicly traded companies is sufficient to bring her case within the scope of section 1514A and therefore, by incorporation, section 922 of Dodd-Frank. Grant Thornton argues that the whistleblower protection provisions of SOX and Dodd-Frank do not extend to cases such as this in which an employee of a contractor to a publicly traded company makes disclosures that have no connection to any publicly traded company.

---

[7] As explained above, section 922(h)(1)(A) of Dodd-Frank incorporates but does not alter the range of whistleblowing conduct that is protected by, inter alia, 18 U.S.C. § 1514A. I therefore focus on section 1514A in my analysis of whether Reyher made protected disclosures. Reyher's retaliatory termination claim is asserted under section 922 of Dodd-Frank because subsection 922(h)(1)(B) provides a purported whistleblower who was discharged with a right of action to seek direct relief in a federal district court. This direct right of action did not previously exist under section 1514A itself.

### B. *Lawson* and the Scope of Section 1514A

In *Lawson v. FMR LLC*, the Supreme Court addressed the question of whether section 1514A of SOX extends to private contractors who perform work for publicly traded companies. 134 S. Ct. 1158, 1161 (2014). The plaintiffs in Lawson were employees of privately held companies that provided advisory and management services to mutual funds. *Id*. at 1164. The mutual funds at issue were public companies that had no employees and contracted with outside investment advisory firms to provide all day-to-day operational services, an arrangement common in the mutual fund industry. *Id*. The plaintiffs alleged that they were terminated after raising concerns about accounting methodologies and SEC registration statements involving the mutual funds. *Id*. They therefore sought the protection of section 1514A, as employees of a contractor to a public company. Their former employer argued that section 1514A only prohibited contractors to public companies from retaliating against employees *of the public company* and did not extend to cover the contractor's own employees. *Id*. at 1164-65.

A majority of the Supreme Court agreed with the plaintiffs, holding that "based on the text of § 1514A, the mischief to which Congress was responding, and earlier legislation Congress drew upon . . . the provision shelters employees of private contractors and subcontractors, just as it shelters employees of the public company served by the contractors and subcontractors." *Id*. at 1161. Three Justices dissented, however, expressing concern that the majority's interpretation section 1514A would extend whistleblower protection to "any employee of the hundreds of thousands of private businesses that contract to perform work for a public company." *Id*. at 1178 (Sotomayor, J., dissenting). Responding to these concerns, the majority opinion noted approvingly, without explicitly holding, that "[t]he Solicitor General further maintains that § 1514A protects contractor employees only to the extent that their

whistleblowing relates to 'the contractor . . . *fulfilling its role as a contractor for the public company, not the contractor in some other capacity.*'" *Id*. at 1173 (quoting Tr. of Oral Arg. 18-19) (emphasis added). Thus, although *Lawson* did not directly address the situation at issue in this case, the *Lawson* majority clearly contemplated that section 1514A would not extend to an individual such as Reyher, who engaged in whistleblowing unrelated to her employer's work as a contractor to public companies.

Applying the *Lawson* decision, another court in this District held that the protections of section 1514A did not extend to an employee of a contractor to a public company who reported fraud that was not committed by one of the public companies with which his employer contracted. In *Gibney v. Evolution Marketing Research, LLC*, the plaintiff alleged that he was terminated by his employer, a private firm, after reporting that a business plan approved by his employer would result in the fraudulent billing of a public company that was a client of his employer. 25 F. Supp. 3d 741, 742 (E.D. Pa. 2014). Chief Judge Tucker, of this District, concluded that the plaintiff was "advocat[ing] for an impermissibly broad definition of SOX protection that was neither intended by Congress nor contemplated by the Supreme Court in *Lawson*." *Id*. at 747. As the Court went on to observe, "[T]he specific shareholder fraud contemplated by SOX is that in which a public company—either acting on its own or acting through its contractors—makes material misrepresentations about its financial picture in order to deceive its shareholders." *Id*. at 748.

I concur with the holding in *Gibney*. A purported whistleblower employed by a private company cannot invoke the protections of section 1514A simply because her employer happens to contract with public companies on matters unrelated to the alleged whistleblowing. Notably, the facts in *Gibney* involved a relationship between a private contractor-employer and a public

company that was less tangential than the relationship alleged in this case. Although the fraud alleged in *Gibney* was committed by the private contractor-employer, it purportedly affected the private contractor-employer's public company client. Reyher, in contrast, does not even assert that the fraud she reported had any effect on her former employer's public company clients. For Reyher, the connection between Grant Thornton and its public company clients is little more than a coincidence. Reyher has not adequately pled that she engaged in conduct that is protected under SOX. As a result, Reyher has not shown that she made any of the required or protected disclosures outlined in subsection 922(h)(1)(A)(iii) of the Dodd-Frank Act. I will therefore grant Grant Thornton's motion to dismiss Reyher's Dodd-Frank whistleblower claim.

### C. Reyher's Pennsylvania State Law Claims

Under 28 U.S.C. § 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it had original jurisdiction. A federal district court is instructed that, "Where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). "Absent extraordinary circumstances, . . . jurisdiction [over claims based on state law] should be declined where the federal claims are no longer viable." *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984). There is no affirmative justification, let alone extraordinary circumstances, that justifies my retaining jurisdiction over Reyher's state law claims. The parties have not even completed discovery. Because I am granting Grant Thornton's motion to dismiss the Dodd-Frank claim, I decline to exercise supplemental jurisdiction over Reyher's remaining state law

claims. I will grant Grant Thornton's motion to dismiss all state law claims, but without prejudice to Reyher to refile those claims in state court.[8]

## IV. CONCLUSION

For the reasons explained above, I find that Reyher has failed to state a claim under section 922 of the Dodd-Frank Act. I will therefore grant Grant Thornton's motion to dismiss with prejudice Count VIII of Reyher's Second Amended Complaint. Because Count VIII provided the sole basis for original federal jurisdiction, I will decline to exercise supplemental jurisdiction over Reyher's remaining state law claims, and I will dismiss those claims without prejudice to Reyher to refile them in a court of a competent jurisdiction.

s/Anita B. Brody

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:	Copies **MAILED** on _____ to:

---

[8] Grant Thornton seeks dismissal of Reyher's state law claims on substantive grounds. I am dismissing these claims solely on the basis that I decline to exercise supplemental jurisdiction over them.